Felix D. **GIPSON**, Plaintiff,

v.

**FLEET MORTGAGE GROUP, INC.,** Fleet Mortgage Corp. and American Security Insurance Corporation, Defendant.

No. CIV.A.3:01–CV–489LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

Nov. 7, 2002.

John Kevin Watson, Samuel E.L. Anderson, Watson & Jernigan, P.A., Jackson, MS, for Plaintiff.

Robert M. Frey, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS, for Fleet Mortgage Group, Inc. and Fleet Mortgage Corp.

Walter D. Willson, Trey Christian Dellinger, Wells, Marble & Hurst, Jackson, MS, for American Security Insurance Corp.

## MEMORANDUM OPINION
## AND ORDER

TOM S. LEE, Chief Judge.

There are pending before the court a number of motions, including a motion for summary judgment by plaintiff Felix D. Gipson, motions for summary judgment by Fleet Mortgage Group, Inc. and Fleet Mortgage Corp. (Fleet), and by defendant American Security Insurance Corporation (American Security), motions by defendants to strike or exclude the testimony of plaintiff's expert William Bryson, Fleet's motion to strike exhibit, motions in limine by each of the parties, and a recently-filed motion to strike by American Security. This opinion considers all but the motions

in limine, which will be separately addressed

Gipson initially brought this action on May 21, 2001 in the Circuit Court of Hinds County against Fleet and American Security relating to a certain American Security insurance policy forced-placed on his home by Fleet, his mortgagor,[1] complaining of two essentially distinct alleged wrongs. First, as explained in greater detail *infra*, he complains of alleged wrongful conduct by both defendants in the forced placement of insurance coverage on the home, challenging the adequacy and cost, and more broadly, the "necessity" of the coverage placed by Fleet and the failure of defendants to disclose information as to the existence and particulars of the business arrangement pursuant to which insurance was forced placed by American Security on Fleet customers. Second, he complains of American Security's alleged inadequate investigation and bad faith denial of his claim for coverage for certain losses sustained as a result of a burglary at the insured property.

There is no dispute as to the following basic facts. In 1992, plaintiff financed his purchase of a home in Jackson with a mortgage loan from Mid–South Investment Corporation; that loan was subsequently assigned to Fleet. The Deed of Trust executed by Gipson obligated him to maintain hazard insurance on the property, and provided that,

> If Borrower fails ... to perform any other covenants and agreements in this Security Instrument, ... then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of ... hazard insurance and other items....

Initially, Gipson complied with his duty, and acquired and maintained a residential hazard insurance policy with State Farm. However, State Farm terminated the policy on December 11, 1996 due to problems with "maintenance." Upon notification of State Farm's termination, Fleet purchased a policy of residential hazard insurance from American Security. Under the policy, Fleet was named as the primary insured, and Gipson was named as an additional insured under an endorsement.

When Fleet first proposed to place this coverage on Gipson's home, it sent him a 60–day insurance binder, and notified him that it would "place a policy for [him] if [he][did] not give them proof of insurance on [his] house," and advised him that the annual premium for coverage would be $897.[2] The binder recited:

> This binder covers your house for risk of direct loss subject to the terms of the policy. This coverage is limited to the house only. Your personal property and liability are not covered. For example, if your house was burglarized, it would not cover the stolen property.

Gipson did not obtain his own insurance in response to this notice, and on March 5, 1997, he was notified by letter that because it had not received evidence that he had renewed his State Farm coverage or obtained a new policy on the house, as was required by the Deed of Trust, Fleet had obtained an insurance policy for the house from American Security. The letter ex-

---

**1.** Plaintiff had originally named two in-state defendants, Mid–South Investment Corporation and Robert Patterson, and filed suit in state court. Upon removal, the court determined that he had no potentially viable claim against Mid–South or Patterson and thus denied plaintiff's motion to remand, since without them as defendants, there is complete diversity of citizenship, and an amount in controversy of more than $75,000.

**2.** His annual premium for his State Farm policy had been $463, and included personal liability coverage and contents coverage.

plained that the annual premium for the policy, a copy of which was included, was shown in the policy, $897, and further recited:

> The policy may be canceled at any time by giving us proof of other acceptable insurance. You have the right to purchase coverage from the insurance company of your choice. Please contact your agent or company to purchase coverage.... Upon receipt of proof of coverage, this policy will be canceled. You will be charged only for the days that this policy was needed. Any unused premium will be refunded to your escrow account.

> The amount of insurance shown on the additional insured endorsement is based on the last known amount of your previous policy. If you have information to verify that the amount shown be different, please notify us....

> This policy insures your house structure only. It does not insure your personal policy, not does it protect you for liability against accidents that occur on your property. For example, if your house was burglarized, it would not cover the stolen property.

The additional insured endorsement recited that the policy did not cover contents.

Prior to expiration of the initial one-year term of the American Security policy, plaintiff was sent a policy renewing the coverage, along with a cover letter essentially identical to the earlier one, with the addition of an explanation that,

> since this policy will insure your house without inspection, the cost may be much higher than the amount you would normally pay. The coverage may be less than you had before.

And when coverage was again renewed for 1998, another identical letter was sent along with a copy of the renewed policy.

In 1998, while the American Security policy was in effect, Gipson's home was burglarized. Among the items stolen were two window-unit air conditioners, a lawn mower and a weed eater. Gipson reported the theft to Fleet, which directed him to American Security. Following an investigation, American Security determined that the cost to effect repairs to the window frame resulting from the thief's ripping out the window air-conditioner units, which totaled $266.12, was covered. It denied his claim for loss of the stolen items on the basis that these items constituted personal property, which were not covered by the policy. After application of the $250 deductible, Gipson was paid $16.12 on his claim.

Ultimately, as a result of plaintiff's failure to make his mortgage payments, Fleet initiated foreclosure proceedings, plaintiff was evicted from the premises and Fleet took title to the property in November 1999.[3]

### PLAINTIFF'S AND AMERICAN SECURITY'S CROSS–MOTIONS FOR SUMMARY JUDGMENT ON COVERAGE

Plaintiff has moved for summary judgment against American Security on his claim that American Security's policy covers his loss from the 1998 theft of the air-conditioner units, lawn mower and weed eater. American Security has filed its own motion for summary judgment as to plaintiff's claim for breach of the insurance contract, and for bad faith failure to pay and failure to adequately investigate plaintiff's claim.

---

**3.** The court notes that plaintiff attributes his ultimate default, in part, to the allegedly exorbitantly-priced insurance forced on him by Fleet, and apparently, to some extent, on American Security's failure to pay benefits on his claim.

The Coverage section of the subject American Security policy states:

**This insurance applies to the Dwelling Property described in the Additional Insured Endorsement which has been issued and is Eligible Real Estate within the description of property covered below, and which is not otherwise excluded.**

COVERAGES

1.  Property Covered
    We Cover:
    a.  the dwelling on the Described Location . . . .
    b.  structures attached to the dwelling;
    c.  materials and supplies on or adjacent to the Described Location for use in the construction, alteration or repair of the dwelling or other structures on this location; and
    d.  **if not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location.**

2.  Property Not Covered
    a.  **Personal property of any kind.**
    . . . .

CONDITIONS

. . .

6.  Loss Settlement. **Covered property losses are settled as follows:**
    A.  Buildings are replacement cost . . . .
    B.  Loss of the following types of property will be settled at the actual cash value of the damaged property at the time of loss. . . .
    (2) Antennas, carpeting, awnings, domestic appliances and **outdoor equipment, all whether or not attached to buildings.**

(Emphasis added). Further, the Additional Insured Endorsement recites as follows:

**This policy covers buildings and structures. It does *not* cover your contents, nor does it provide you with any liability coverage. In addition, the amount of insurance *may not* be high enough to fully indemnify you in case of a loss to your Dwelling Property.**

(Emphasis in original). In response to his claim for coverage under the policy, American Security denied coverage for the stolen items on the basis of the policy exclusion for "personal property of any kind."

■ Plaintiff has moved for partial summary judgment on the issue of American Security's contractual liability for the stolen air conditioner units, the lawn mower and the weed eater.[4] He maintains that although it purports to exclude "personal property of any kind," the policy specifically purports to cover "building equipment and outdoor equipment used for the service of and located on the Described Location," a description which he submits plainly covers the air conditioner units and lawn equipment, i.e., lawn mower and weed eater, that undeniably were "used for the service of and located on the Described Location."

In its motion for summary judgment, or in the alternative, partial summary judgment, American Security argues that its claims decision was correct, focusing on the policy's provision that the insurance applies to "Dwelling Property . . . and is Eligible Real Estate . . . and which is not otherwise excluded;" the further exclusion from coverage for "personal property of any kind;" and the provision in the Additional Insured Endorsement that the policy "only covers buildings and structures" and "does not cover your contents. . . ."

---

**4.** The record reflects that other items were taken, including an electric hedger and gas blower. It appears that Gipson has conceded that these other items are not covered under the policy.

Having considered the language of the policy and the parties' arguments, the court concludes that as a matter of law, the policy provides no coverage for the stolen lawn mower and weed eater. By its terms, the policy covers only "Dwelling Property" that is "Eligible Real Estate," and excludes "personal property of any kind." The lawn mower and weed eater plainly are *not* "eligible real estate" and plainly *are* "personal property." The coverage section of the policy does include language of coverage for "outdoor equipment used for the service of and located on the Dwelling Location." But that language cannot be considered in isolation and must instead be considered in reference to the language which precedes it. That language purports to provide coverage for "real estate," including "outdoor equipment used for the service of and located on the Described Location." In the court's opinion, the only reasonable construction of the coverage for "outdoor equipment" would be outdoor equipment which is "eligible real estate" and "which is not personal property," that is used "for the service of and located on the Described Location."[5] That is to say, it would not be reasonable to construe this policy as applying to lawn mowers and weed eaters, which are clearly the homeowner's personal property, and for which this homeowner could have had no justifiable expectation of coverage.[6]

■ The air conditioning units present a closer question. Plaintiff appears to assert that coverage exists for the air conditioners under the same coverage provision, characterizing them as coming with the coverage for "building equipment and outdoor equipment used for the service of and located on the Described Location." It seems to the court, however, that this may not be an accurate characterization of the air conditioners, which could not readily be said to be building equipment, and which presumably protruded into the home's interior and presumably were powered by an indoor electrical outlet and thus not "outdoor equipment." In the court's view, then, the pertinent question as to the air conditioners is whether they were part of the real estate, and hence covered, or whether they instead constituted "personal property," and were consequently excluded from coverage.

In support of its position that all of the subject property, including the air conditioners, constituted personal property, American Security points to Webster's definition of "personal property," as "Temporary or movable property as distinguished

---

5. The "Conditions" section of the policy describes the basis for claims payments, and states that "Covered property losses are settled as follows:

   ... Loss of the following types of property will be settled at the actual cash value of the damaged property at the time of loss.... (2) Antennas, carpeting, awnings, domestic appliances and **outdoor equipment, all whether or not attached to buildings.**" (Emphasis added).

   Plaintiff argues that the emphasized phrase, "all whether or not attached to buildings," reflects coverage for outdoor equipment used for the service of the property, whether or not such equipment is attached to buildings. However, as noted by American Security, this provision establishing the basis for claims settlement is first and foremost subject to the proviso that it is relevant only to "covered property losses," as the provision itself states. Therefore, unless the loss of or to the property is covered (and not excluded) under the policy's coverage provisions, there will be no settlement on any basis.

6. Certainly, the lender, whose motivation was to protect the mortgaged property (which would not include the lawn mower and weed eater), would have no interest in insuring its borrower's lawn mower and weed eater; or his hedge trimmer; or his hedge clippers; or any other items in the seemingly endless list of tools or implements that might be stored outside yet used in the upkeep and maintenance of the dwelling property.

from real property," and to the Black's Law Dictionary of the term as "everything that is the subject of ownership, not coming under the denomination of real estate." It is undisputed that the air conditioners were movable, and by their nature could have been easily removed by nothing more than the removal of screws. Moreover, in other contexts, courts in other cases have routinely held that window air conditioners are by their nature "personal property," and not part of the real estate. *See, e.g., Process Systems, Inc. v. Huddleston,* No. 101801–I, 1996 WL 614526, at *2 (Tenn. App.1996) (recognizing that Tennessee tax statutes provide that "[t]angible personal property which is sold and attached to real property, but which will ordinarily be removed by the owner or tenant, such as window air conditioning units, curtain and drapery rods, gasoline pumps, etc., shall be deemed to be personal property and the installation charges therefor shall be subject to the Sales or Use Tax"); *Sentinel Mgmt. Co. v. County of Hennepin,* Nos. TC–18600, TC–21855, 1996 WL 11167, at *2 (Minn.Tax 1996)(noting that there was no Minnesota statute defining personal property and no Minnesota cases addressing what constitutes personal property for tax purposes, but concluding that window air conditioners which could be removed without substantial damage to them or to the apartment were personal property); *Consiglio v. Carey,* 12 Mass.App.Ct. 135, 421 N.E.2d 1257 (1981) (holding that window air conditioning units that could be removed without damage to themselves and without material damage to the premises constituted personal property); *Parkdale State Bank v. McCord,* 428 S.W.2d 121 (Tex.Ct.Civ.App.1968) (window unit that could be removed without material injury to land and existing improvements constituted personal property and was not subject to lien on land under deed of trust); *cf. Balderston v. Balderston,* 71 Md.App. 390, 397, 526 A.2d 59, 63 (Md.

App.1987) (stating that "[i]nstallation of window air conditioners is not a permanent addition to real property and is not a capital improvement").

Plaintiff has cited no authority in support of the proposition that window air conditioning units are not personalty, or presented any evidence tending to show that circumstances relating to the particular air conditioners which were stolen from the insured premises were not merely personal property. However, the question of how they would be most appropriately categorized is not free from doubt, and may depend on the particular circumstances of these units, e.g., whether they "came with the house." *See In re Cooperstein,* 7 B.R. 618, 622 (Bkrtcy.N.Y.1980) ("A central air-conditioning system would be a fixture just like a central heating system; a sufficiently built-in window-type unit ought to pass with the real estate as well, but an easily removable window air conditioner probably is still personalty.") (quoting Brown, *The Law of Personal Property,* p. 531–32 (3rd ed.1975)); *Crumbley Grocery Co. v. Ferguson,* 159 Miss. 861, 132 So. 737, 739 (1931) (where the question was whether certain items passed with the property under a deed, the Supreme Court affirmed a circuit court's instruction that " 'a conveyance of real estate carries with it to the grantee the ownership of such articles as were then actually fixed or fastened to the freehold— as, for example, bakers' tables, trays, etc., fastened to the building by nails,—and such articles so affixed to the freehold were a part thereof, and could not, after such conveyance, be seized under execution as personal property of the grantor' "). Accordingly, the court will deny the parties' cross-motions for summary judgment on the issue of coverage for the air conditioners.

■ In the court's opinion, plaintiff has no basis for claiming the right to jury

consideration of punitive damages on his claim of coverage for the lawn mower and weed eater in view of the court's conclusion that American Security reasonably and correctly denied his claim for benefits for these items. And although the court concludes that American Security is not at this time entitled to judgment as a matter of law that the policy provides no coverage for the theft of the air conditioners, that conclusion is no impediment to a grant of summary judgment for American Security on the issue of its alleged bad faith in either the investigation of the claim for such coverage or for the denial of benefits on the claim.

The insurer reasonably interpreted the policy as excluding coverage for personal property, consistent with the policy's clear intent and purposes; and its conclusion that the window units were excluded personal property was not unreasonable, given that such units have regularly been found to be personal property based on their portability and ease of removability. That is to say, the court accepts American Security's contention that reasonable minds could not differ with the proposition that the language in the main body of the policy, as well as the language in the additional insured endorsement excluding coverage for personal property, clearly gave American Security a reasonably arguable

basis to deny the claims for all of the disputed items.

■ Plaintiff suggests that a jury could find American Security to have acted in bad faith based on the patent inadequacy of its investigation and adjustment of his claim for benefits, and in support of this assertion offers a lengthy list of acts and/or omissions which he maintains exemplify the gross inadequacy of the company's investigation and handling of his claim. *See Stewart v. Gulf Guar. Life Ins. Co.*, —— So.2d ——, ——, No.2000–CA–01511–SCT, 2002 WL 1874826, *7 (Miss. Aug.15, 2002) (stating, "This court has recognized that the issue of punitive damages may be submitted, notwithstanding the presence of an arguable basis, where there is a question that the mishandling of a claim or the breach of an implied covenant of good faith and fair dealing may have reached the level of an independent tort."). In the court's opinion, all of these assertions are without merit as a matter of law,[7] and only one warrants brief mention, that being his assertion that American Security acted in complete derogation of its duty in failing to ascertain the circumstances of the air conditioners, including the manner in which they were installed, whether they were in the house when it was purchased and plaintiff's intentions with respect to them. While it might be argued that the

---

7. Plaintiff charges that (1) there were insufficient facts for American Security to determine whether the equipment was "personal property;" (2) there were insufficient facts for the adjuster to calculate benefits for the building and outdoor equipment; and that there are issues of fact concerning (3) whether the adjuster, Southeastern Claims, unilaterally and without authority made the claims decision and whether its premature decision was based on inaccurate information; (4) whether the adjuster relied on inaccurate information; (5) whether American Security used qualified people to investigate the claim; (6) whether

plaintiff was denied an effective means of bringing his contested claims to the attention of the company; (7) whether American Security had sufficient claim guidelines or failed to adequately monitor its adjusters and claims examiners; (8) whether it provided proper training to its claims examiners and adjusters; (8) as to what is really covered under the policy since American Security's claims examiners and Southeastern Claims all disagree as to what equipment is covered under the policy at issue; and (10) as to whether the claims examiner at American Security violated American Security's policy and procedure of resolving ambiguities.

failure to have inquired as to these matters *may have* been negligent, it cannot be said to have amounted to "a willful or malicious wrong, or . . . gross or reckless disregard for [its] insured's rights." *Id.*[8] Accordingly, summary judgment is proper on these claims.[9]

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON FORCED PLACEMENT OF INSURANCE ON THE MORTGAGED PROPERTY

Plaintiff has sued Fleet and American Security complaining that Fleet forced-placed insurance from American Security at an inflated price, passed the cost on to the borrower, and then received some of the inflated price in the form of commissions for free services.

### American Security

■ Plaintiff has sued American Security for breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud and civil conspiracy. American Security contends in its motion for summary judgment that plaintiff cannot state a claim against it for breach of fiduciary duty, and reference to the Mississippi Supreme Court's decision in *American Bankers' Insurance Company of Florida v. Wells*, 819 So.2d 1196 (Miss.2001), confirms that plaintiff has no viable claim for breach of fiduciary duty against either American Security or Fleet. In *Wells*, a forced-placement case, the court stated,

8.  And, while recognizing that it has decided to deny summary judgment for either party on the actual determination of whether the air conditioners are covered, it is notable that plaintiff has not suggested that pursuit of this area of inquiry would have generated any information which would have rendered the company's claims decision erroneous.

9.  The court notes that in his response and brief in opposition to American Security's motion for summary judgment, Gipson argues that there is an issue of fact as to whether

*We find that a fiduciary relationship between a lender and a borrower does not arise when the lender breaches the lending contract.* Indeed, in *General Motors Acceptance Corp. v. Baymon*, 732 So.2d 262 (Miss.1999), we rejected arguments that a lender who had obtained CPI under circumstances similar to those in the present case owed a fiduciary duty to the borrower. We held:

> Baymon is unable to demonstrate that her relationship with GMAC was fiduciary in nature. There is no evidence in the record that GMAC created an expectation in Baymon that it would protect her interests, nor that she was lulled into a false sense of security by relying on GMAC. Indeed, GMAC's repeated warnings that CPI might not fully protect Baymon's interests clearly prevented any fiduciary expectations on her part. As a result, this Court finds that no fiduciary relationship existed between GMAC and Baymon.

*Id.* at 270. Based on *Baymon*, there is no basis on which we might hold that Fidelity owed [its borrowers] a fiduciary duty.

*There is even less reason to conclude that American Bankers might owe a fiduciary duty to Fidelity's borrowers.* American Bankers had no contractual relationship with Fidelity's borrowers, and the American Bankers CPI policy in

American Security's failure to give him an insurance refund for unearned premium constituted a breach of the insurance contract. This claim does not appear in the complaint, and for that reason is not cognizable. The court is aware of plaintiff's apparent view that any claims he deigns to include in the pretrial order become part of his case as a matter of course. However, a plaintiff cannot simply add new claims to the case via a pretrial order. Although there are other bases for rejection of this claim, the court is warranted in stopping at this one.

question served only to protect Fidelity's interest in the collateral. [The borrowers] cite no authority holding that a collateral protection insurer owes a fiduciary duty to borrowers with whom it has no contractual relationship; therefore, they failed to establish a cause of action against American Bankers for breach of fiduciary duty.

*Wells,* 819 So.2d at 1205–06 (emphasis added).

■ Neither can plaintiff state a claim against American Security for breach of the duty of good faith and fair dealing relative to the forced placement of insurance since American Security was not a party to the contract authorizing same. *See Wells,* 819 So.2d at 1207 (concluding that collateral protection insurer owed no duty of good faith and fair dealing because the contract which permitted the lender to obtain collateral protection insurance was between the lender and borrower, not the borrower and insurer).

■ That leaves with respect to American Security plaintiff's claims for fraud. Plaintiff's charge of fraud against American Security concerns both allegations of affirmative misrepresentation and of non-disclosure. None of the allegations, however, constitute a cognizable fraud claim. Plaintiff charges that defendants committed fraud by concealing from and/or failing to disclose to him the fact of their arrangement by which kickbacks and commissions were allegedly paid to Fleet by American Security and passed on to him. However, defendants had no duty to disclose any such information to plaintiff. *See Wells,*

819 So.2d at 1206 (stating that "there were doubtless aspects of the relationship between [insurer and lender] which were not apparent to [the plaintiffs]. However, [plaintiffs] are unable to demonstrate any specific representation ... which might give rise to a fraud cause of action....").

■ Plaintiff has identified a number of what he contends are affirmative misrepresentations by American Security. First, plaintiff asserts that American Security and Fleet misrepresented to him that the policy for which he was being charged premiums provided $78,000 coverage when, in fact, it did not. The basis for plaintiff's allegation in this regard is traceable to American Security's 1988 submission to the Mississippi Department of Insurance by which it first sought regulatory approval of its Residential Mortgage Service Program. That submission contained a "Limit of Liability" provision, which recited that "[t]he company shall be liable for the limits stated in the policy but never to exceed the original amount of indebtedness." Seizing on this language, plaintiff has taken the position that since American Security's liability according to its filed rate was limited to the amount of plaintiff's original indebtedness, which was only around $51,860, then by issuing a policy which purported to cover his home in an amount that was nearly $30,000 more than the amount of his original indebtedness, both defendants committed fraud. That is, because American Security's limit of liability according to its filed rate was only $51,860, then defendants' representation to plaintiff that he was paying for $78,000 in coverage was fraudulent.[10] For the rea-

---

**10.** The court would observe that to the extent that plaintiff is claiming that $78,000 of coverage was unnecessary and/or unreasonable, such claim is barred by the statute of limitations. When policies were placed in each of the years 1996, 1997 and 1998, plaintiff was explicitly informed of the amount on which coverage was being placed; and he was

aware that his loan documents granted the lender the right to do whatever was "necessary to protect the value of the collateral." *Cf. American Bankers' Ins. Co. v. Wells,* 819 So.2d 1196 (Miss.2001) (where promissory note gave lender right to purchase insurance in the event borrower failed to maintain coverage, certificates of insurance sent to bor-

sons that follow, the court rejects plaintiff's position with regard to this issue.

First, the court recognizes that in his complaint, plaintiff did allege that the defendants fraudulently misrepresented the coverage available under the forced placed insurance. Plainly, however, this is not what he had in mind when he made this allegation, for plaintiff has indicated that he was unaware that this Limit of Liability even existed until April 2002, when he received the documents in discovery which contained the Limit of Liability; yet plaintiff did not seek to amend his complaint to allege such a claim, nor, evidently, was any mention made of this putative claim in the discovery, including depositions, that followed disclosure of the documents. Thus the court is warranted in rejecting this claim on the basis that it has not been pled. But even had it been, summary judgment would be in order as to such claim, for in the court's opinion, the evidence does not tend to support plaintiff's contention that any limit of liability, other than the $78,000 face amount of the policy itself, applied to the plaintiff's policy.

A review of the documents submitted by American Security to the Department of Insurance confirms its 1988 submission containing the Limit of Liability language. However, such review also reveals that subsequent submissions to the Department of Insurance in 1989 and later in 1992, i.e., several years prior to commencement of American Security's arrangement with Fleet and long before plaintiff's policy was issued, do not include the Limit of Liability language. This raises the question whether the Limit of Liability included in the 1988 submission applied to policies issued after the later submissions, including the policy issued on plaintiff's home. For its part, American Security maintains that the

Limit of Liability that had been included in its original submission to the Department of Insurance was eliminated in its subsequent filings, and is consequently irrelevant to plaintiff's policy, which indisputably provided coverage in the face amount of $78,000. Plaintiff, on the other hand, submits that the Limit of Liability did apply to his policy. In support of that position, plaintiff furnished an affidavit executed by Nellie Mitchell, Director of the Rating Division of the Mississippi Department of Insurance, in which she stated, "the 'Limitation of Liability' would be applicable to any and all policies sold after March 16, 1988 pursuant to this Mortgage Service Program."

American Security has moved to strike Mitchell's original affidavit on various grounds, one of which plainly has merit. Specifically, in a new affidavit submitted by American Security, Mitchell "clarifies" that her statements in the earlier affidavit that the Limit of Liability would apply to policies sold after March 16, 1998

> was based on the fact that from the documents furnished, it appeared that two separate programs of insurance were involved, namely the Mortgage Service Program and the Residential Mortgage Service Program, and the Limit of Liability ... related to the Mortgage Service Program and not the Residential Mortgage Service Program.

Mitchell goes on to state that she

> cannot conclusively determine that the two programs are indeed separate or one and the same, as I have no first hand knowledge of such filings....

In light of Mitchell's more recent affidavit which discloses a lack of personal knowledge of the matters to which her first affidavit was addressed, the court con-

rower upon forced placement which set forth date policy became effective gave borrower adequate notice that the policy had been

backdated and commenced start of limitations period).

cludes that her original affidavit must indeed be stricken.

Although Mitchell states that she cannot "conclusively determine" from a review of the documents submitted by American Security to the Department of Insurance whether or not the Mortgage Service Program and Residential Mortgage Service Program were "one and the same," it certainly appears to the court that they were. And according to Mitchell's more recent affidavit, "[g]enerally, the most recent rate manual page filed with and approved by the Mississippi Department of Insurance will supersede any previously approved filings for the same program." Thus, American Security's post–1988 filings, which *did not contain the Limit of Liability*, would control.

Even if these were not "one and the same program," however, the conclusion that the Limit of Liability did not apply to plaintiff's policy would still be unavoidable, given that the Limit of Liability is *not* a feature of the Residential Mortgage Service Program, and plaintiff's policy was issued on the form approved for American Security's Residential Mortgage Service Program. In sum, then, plaintiff has failed to present competent evidence sufficient to create a triable issue as to whether defendants misrepresented the amount of insurance provided by the policy.

■ Plaintiff also appears to take the position that the rates charged to him for insurance coverage by American Security were fraudulent because they were based on a rate for which American Security secured approval from the Mississippi Department of Insurance by materially false representations to the Insurance Department as to its loss ratio and expense ratios. This claim, as well as all plaintiff's claims against American Security based on the rates charged, is barred by the filed rate doctrine. In *Wells*, the court applied the filed rate doctrine to rates approved by

the Department of Insurance, and explained:

Under the filed rate doctrine, any "filed rate"—that is, a rate approved by the governing regulatory agency—is "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994); *United Gas Pipe Line Co. v. Willmut Gas & Oil Co.*, 231 Miss. 700, 718, 97 So.2d 530, 535 (1957) (petitioner "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms") (quoting *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951)).

The filed rate doctrine is based upon sound considerations of law and judicial policy. A civil juror, who likely has little, if any, expertise in the area of insurance rates and policies, should not be permitted to reject and thereupon impose liability based on the rates of a policy which was expressly approved by the Department of Insurance. *See* Miss. Code Ann. §§ 83–1–1 et seq. (1999). Permitting a jury to impose liability in such circumstances would result in a judicial infringement upon the duties and responsibilities which are expressly delegated by the Legislature to the Department of Insurance. *Id.*

*Wells*, 819 So.2d at 1203–04.

In this case, plaintiff's claims against American Security plainly represent a direct challenge to the reasonableness of its approved rates. And while plaintiff proposes to avoid this bar on the basis that American Security secured approval of its rates by submission of materially false information to the Department of Insurance, this court is not persuaded that the Missis-

sippi Supreme Court would countenance his efforts. That court did state in *Wells* that a plaintiff "might have a valid cause of action against his lender for a breach of the duty of good faith and fair dealing if it could be shown that the lender engaged in bad faith conduct in the *performance* of a contract approved by the Department of Insurance, rather than in the actual rates of such a policy," *id.* at 1204 (emphasis in original), and further observed that the plaintiffs therein had asserted some claims which "arguably [fell] outside of the scope of the filed rate doctrine," including claims that the lender and insurer should be held liable for

> *[c]ommitting fraud in connection with their own filed rates* and/or exceeding what was allowed to be charged under their own filed rates by: 1. Basing premiums on eighteen months rather than twelve months in order to charge additional premiums; and 2. *By adding a forty-five percent surcharge to premiums when their own actuary stated that this charge was not based upon any objective underwriting criteria.*

*Id.* (emphasis added).[11] Plaintiff argues that the emphasized language signifies the court's recognition of a fraud exception to the filed rate doctrine. However, this court does not interpret the court's opinion in *Wells* as authorizing a plaintiff to challenge the reasonableness of a rate approved by the regulatory agency on the basis that the agency's approval was obtained by fraud. In fact, in remanding the case for a new trial, the court in *Wells* expressly directed that the plaintiffs "be limited to recovery for damages (if any) resulting from tortious conduct in the *performance,* rather than the rates and terms, of the contract in question," *id.* (emphasis in original), and cautioned the trial court to

be careful ... to prevent the jury from imposing liability based upon the rates of the policies in question which are subject to oversight by the Department of Insurance in the exercise of its statutory mandate. We are required to give judicial deference to the jurisdiction and authority granted to a governmental agency by the Legislature.

*Wells,* 819 So.2d at 1205.

In *Wegoland, Ltd. v. NYNEX Corp.,* 27 F.3d 17, 19 (2d Cir.1994), cited by the Mississippi Supreme Court in *Wells,* the plaintiffs alleged that the defendants had provided the "regulatory agencies and consumers misleading financial information to support the inflated rates they requested." *Wegoland, Ltd. v. NYNEX Corp.,* 806 F.Supp. 1112, 1113 (S.D.N.Y.1992). The Second Circuit rejected the notion that fraud practiced on the regulatory agencies constituted an exception to application of the filed rate doctrine, observing,

> The regulatory agencies are deeply familiar with the workings of the regulated industry and utilize this special expertise in evaluating the reasonableness of rates. The agencies' experience and investigative capacity make them well-equipped to discern from an entity's submissions what costs are reasonable and in turn what rates are reasonable in light of these costs.

If courts were licensed to enter this process under the guise of ferreting out fraud in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system. For only by determining what would be a reasonable rate absent the fraud could a court determine the extent of the damages. And it is this judicial determina-

---

11. In its earlier opinion in *American Bankers Insurance Company of Florida v. Alexander,* 818 So.2d 1073, 1085 (Miss.2001), the su-

preme court observed that jurisdictions are split on applying such a fraud exception, but did not undertake to consider the issue.

tion of a reasonable rate that the filed rate doctrine forbids.

*Wegoland,* 27 F.3d at 21. By far, the majority of courts to have considered the issue have come to the same conclusion, for reasons well stated in *Wegoland, see, e.g., Taffet v. Southern Co.,* 967 F.2d 1483, 1488–90 (11th Cir.) (en banc) (filed rate barred RICO action because customers had suffered no legally cognizable injury), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *H.J. Inc. v. Northwestern Bell. Tel. Co.,* 954 F.2d 485, 494 (8th Cir.) (filed rate doctrine barred RICO claims for fraud on agency), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992); *Marco Supply Co. v. AT & T Communications, Inc.,* 875 F.2d 434, 436 (4th Cir.1989) (filed rate doctrine barred claim of price misrepresentation), and this court perceives no basis in *Wells* for doing otherwise.[12]

■ Plaintiff additionally contends that in letters sent to him advising of the forced placement of coverage, American Security and Fleet misrepresented to him that the basis for the rates for the coverage were higher because of the lack of inspection. The letters to which he refers stated, "since this policy will insure your house without inspection, the cost may be much higher than the amount you would normally pay." Aside from the fact that he has not in his complaint identified this statement or any similar statement as a basis for alleged fraud, plaintiff has presented no evidence to suggest that if this was in fact an untrue statement, he in any way relied on it.[13] Plaintiff's memorandum does "assure the Court that he would have gotten insurance elsewhere instead of relying on Fleet for coverage if he had known all of the facts." However, there is no record evidence, so far as the court is aware, to suggest that plaintiff would have done anything differently had he known that the reason the premium rate was higher was unrelated to any lack of inspection of the property.[14]

For all of the foregoing reasons, the court concludes that plaintiff's motion for partial summary judgment against American Security is not well taken and should be denied, and American Security's motion will be granted, except as to plaintiff's claim for coverage of the stolen air conditioning units.

*Fleet:*

■ Plaintiff's charge as to Fleet is that Fleet received some sort of compensa-

12. The court would also note that to the extent the plaintiff relies on such an allegation as a basis for fraud upon *him,* he has the burden not only of proving each of the elements of a fraud claim, which does not appear possible, but also of *pleading* them; and no claim such as this appears in the complaint.

13. American Security objects that the only "evidence" submitted by plaintiff in support of the assertion that the premium was not higher due to lack of inspection is an unauthenticated document reflecting that Fleet, not American Security, had inspected the property. It submits that this exhibit is not admissible at all, and is certainly not admissible as to it. The court need not resolve this question, for there are other grounds on which dismissal of this claim is in order.

14. In fact, it would seem unlikely that one who knows that the insurance premium on his home is significantly higher for significantly less coverage than he had or could obtain elsewhere (assuming he presented an acceptable risk to a standard insurer) and yet did nothing to avoid this high cost/less coverage situation would have bothered to change his coverage had he known that the reason the cost was greater had nothing to do with the fact that the property had not been inspected by the lender or insurer. This, of course, is not a conclusion, but rather an observation. The court's conclusion is that there is an absence of any allegation or proof that Gipson would have done anything differently if this information had been imparted to him.

tion, termed variously as "kickbacks" or "freebies," or more benignly, commissions or financial incentives, from American Security in return for buying its forced-placed insurance from American Security, the costs of which were recouped from Fleet's borrowers on whose property such insurance was forced-placed. Although Fleet's motion for summary judgment was initially premised largely (though not exclusively) on the absence of any actual evidence of such commissions or payments, Fleet's Rule 30(b)(6) designee, Ivan Hobbs, has since testified at his reconvened deposition that prior to January 2000, in addition to its annual savings of $700,000 to $900,000 as a result of an arrangement with American Security whereby Fleet insurance personnel were transferred to American Security which then charged Fleet a fee for insurance tracking services, Fleet also received an additional $200,000 yearly administrative fee from American Security.[15] Although Fleet has submitted affidavits of Hobbs and one Dennis Dorman toward establishing that Hobbs' testimony was simply a mistake, the court must accept Hobbs' deposition testimony as true for its present purposes.[16] That is, the court accepts as true for present purposes that American Security paid Fleet commissions in order to obtain Fleet's forced-placement insurance business.

**15.** Regarding this testimony, Fleet states that Hobbs "apparently stated that Fleet did receive commissions from American Security prior to January 1, 2000," but that this testimony was simply an error.

**16.** Plaintiff has submitted a motion to submit a surrebuttal brief addressed to this issue, and one other. That motion is granted.

**17.** Of course, the court has already concluded that claims based on the amount of coverage provided by the policy are time-barred, and that conclusion applies equally to Fleet and American Security.

**18.** The court notes that in addition to his claims directly relating to the forced place-

Fleet asserts that it is nevertheless entitled to judgment for "three separate and independent reasons." It contends specifically that (1) plaintiff's claims are barred by the statute of limitations; (2) his claims are barred by the filed-rate doctrine; and (3) his claims are barred by the doctrine of res judicata.

The court rejects Fleet's statute of limitations argument. The court does recognize that plaintiff was sent notice more than three years prior to the date on which he filed suit advising that insurance was being placed on his property, that the insurance cost more and that it provided less coverage than he might otherwise pay. See Miss.Code Ann. § 15–1–49 (establishing three-year statute of limitations). However, plaintiff argues that the letters did not give him notice of, and he could not otherwise have known that the reason the insurance charge had increased was Fleet's receipt of fees and commissions. In the court's opinion, this circumstance precludes an adjudication as a matter of law that plaintiff's claims against Fleet are time-barred.[17]

The court likewise rejects Fleet's claim that plaintiff's claims herein are barred by the doctrine of res judicata. In the court's view, plaintiff could not have raised in the foreclosure proceedings claims of which he neither was nor should have been aware.[18]

ment of insurance, plaintiff has claimed in this case that Fleet breached its contract by demanding certain advance costs and mortgage amounts to prevent foreclosure. The court has reviewed the parties' submissions relative to this issue, and concludes that plaintiff has no viable claim. Plaintiff states that he was informed by letter in April 1999 that he owed $4612 in overdue mortgage payments, which would need to be paid if he was to avoid foreclosure. This money was not paid, and two months later, on July 2, 1999, a second letter was sent which stated that an $8,453.19 payment was due, which included, inter alia, a $250 charge for publication for foreclosure, and charges for attorney's fees. Plaintiff contends that the publication costs

■ That brings the court to Fleet's contention that plaintiff's claims are barred by the filed-rate doctrine. The Deed of Trust executed by plaintiff provided,

> If Borrower fails ... to perform any other covenants and agreements in this Security Instrument, ... then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of ... hazard insurance and other items. . . .

In this litigation, plaintiff essentially takes the position that while this language in the Deed of Trust did authorize Fleet to pay for hazard insurance and to charge the cost of such insurance to plaintiff, it did not authorize Fleet to charge plaintiff for other fees associated with its acquiring hazard insurance. And he submits that because Fleet entered into an arrangement with American Security by which it was paid fees and commissions which Fleet allowed to be recouped from its borrowers, Fleet breached its contract and its concomitant duty of good faith and fair dealing to its insureds since it charged him for more than the mere purchase of hazard insurance, and because it was not "necessary to protect the value of the Property and Lender's rights in the Property" that Fleet's borrowers be charged these fees. The court is not persuaded that the filed rate doctrine bars a claim such as this, which is not so much a challenge to the rate itself as it is to the lender's right

under the lending contract to place insurance in such a manner as to cause its borrowers' payment of unnecessary fees.

For the reasons given, then, the court concludes that plaintiff's claim against Fleet for breach of contract survives Fleet's motion for summary judgment.

### FLEET'S AND AMERICAN SECURITY'S MOTION TO STRIKE OR EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT, WILLIAM BRYSON

■ Both defendants have moved to exclude the testimony of plaintiff's expert. For the reasons expressed by the court at the pretrial conference, and based further on the court's rulings herein on the parties' summary judgment motions, the court concludes that defendants' motions should be granted.

As reflected in his expert report, Bryson has opined as follows:

— that the rates, services and coverages provided by the policy at issue were "unreasonable, excessive and/or not necessary;"

— the amount of insurance placed on the property was in excess of the amount necessary to protect the mortgagee's interest in the property;

— replacement cost insurance was not needed to cover the mortgagee or mortgagor's interest;

— the premiums charged to Gipson were exorbitant and more than twice

---

were not, in fact, due when demanded of him, and that this extra $250 contributed to his eviction; that the other costs charged to him, including attorney's fees, were also "questionable" given that the two previously threatened foreclosures had never in fact occurred; and he states that it is "questionable as to the reason the amount to save [his] property jumped approximately $4,000 in only two months," from April 29, to July 2, 1999. In the court's view, this claim is subject to

Fleet's res judicata defense, but is without merit in any event. Fleet has fully explained the basis for all the charges, including the fact that the April letter covered only plaintiff's arrears from April 1998 through February 1999 (at a cost of $567 for each month) whereas the July letter included the additional arrears for the months of March through June 1999, together with late charges, attorney's fees, title fees, publication fees and a recording fee.

competitive rates in Jackson, and that Gipson could have purchased a far superior product with the same amount of structure coverage plus $54,600 of personal property coverage and $100,000 liability insurance coverage for $441.96;
— that if the evidence reveals that commissions, administrative fees and/or administrative services were somehow included in Gipson's coverage and/or premiums, this would be further evidence that the coverage was unreasonable and unnecessary to protect the value of the property;
— that the investigation and adjustment of Gipson's claim was inadequate;
— there was no investigation or adjustment of the items for which payment was sought "even though the air conditioning, yard and other equipment located on and used for the service of the subject premises were all expressly covered under the provisions of the insurance contract;" and, finally,
— "Based on the plain language of the subject policy there was no reasonably arguable basis for denying coverage of these particular items."

Fleet has moved to exclude Bryson's testimony on the bases that (1) he has no background or experience with lender-placed insurance and (2) the data he used to analyze plaintiff's claims was inaccurate, irrelevant and flawed, making it an unreliable basis for an expert opinion. Even assuming that there was arguably some relevant topic vis-a-vis plaintiff's forced-placement upon which Bryson could otherwise testify if qualified, it is apparent to the court that his qualifications are lacking and that data underlying his opinion is flawed.

As noted by Fleet, Bryson's experience in the insurance business, upon which his expertise is grounded, has been in casualty and property insurance. He has admitted that he is "not familiar with a lot of lender placed insurance," and is "not exposed to that in his business to a great extent." In fact, Bryson testified that only once has he dealt with lender-placed insurance, which was more than twenty years ago; and he does not remember the details of the transaction. He specifically testified that he "would have no idea" whether lender-based policies have different rates than other policies; that while he knows that this particular lender-placed policy was priced higher than other coverages, he is "not familiar with other" "lender-placed insurance policies," and thus "doesn't know" if they are also higher.

Fleet's further contention that Bryson's testimony is based on "irrelevant, inaccurate and flawed data" focuses on a comparison quote prepared by Bryson in order to demonstrate that Gipson could have secured far superior coverage and a cheaper price than that charged for the American Security policy. Indeed, the quote he prepared is not a valid basis for comparison for many reasons, including the facts that Bryson did not use a lender-placed insurance scenario to calculate the quote, but rather assumed a homeowner seeking coverage for himself; the assumptions Bryson used in calculating the quote plainly failed to account for this particular homeowner's situation in that he assumed numerous discounts that manifestly would be unavailable to this plaintiff (e.g., a "plus discount" for insureds over the age of 50, and discounts for a new home, a home security system, and for the insured's having had no claims within the preceding few years, none of which applied to Gipson); and he calculated his sample quote based on a $1,000 deductible, when Gipson's deductible under the American Security policy was only $250.

Finally, with regard to Bryson's opinion that replacement coverage was not needed, he admitted that he had merely assumed

"from the circumstances" that the house would not be rebuilt, but he admitted that he had not talked to Gipson or read his deposition, and thus did not know what the true facts were.

As is evident from the foregoing, Fleet's objections are well taken as they relate to Mr. Bryson's opinions regarding the relative cost of other coverage, and his opinions as to the reasonableness and necessity of the policy placed by Fleet. The court recognizes that an expert is not required to be a "specialist" in order to testify and that oftentimes limitations may be explored through cross-examination; but Mr. Bryson's knowledge base extends only to the standard insurance market, and as plaintiff has himself acknowledged, no expert is needed to establish that more coverage could have been obtained at a lesser price in the standard insurance market.

American Security has joined in Fleet's motion to exclude Bryson's testimony as to matters relating to the reasonableness and/or necessity of the coverage forced placed, and has moved separately to strike his proffered testimony pertinent to Gipson's bad faith claims. In the court's opinion, in light of the court's ruling on American Security's summary judgment motion, Mr. Bryson's testimony in this regard is not relevant.

Accordingly, defendants' motion to exclude and/or strike Mr. Bryson's testimony will be granted.

### CONCLUSION

Based on the foregoing it is ordered that plaintiff's motion for partial summary judgment is denied; American Security's motion for summary judgment is granted in part and denied in part, as set forth herein; Fleet's motion for summary judgment is granted in part and denied in part as set forth herein; and defendants' mo-

tion to strike/exclude the testimony of plaintiff's expert is granted.